IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CURTIS LEE HENDERSON, SR.,          )    No. C 07-2838 SBA (PR)
                                    )
              Plaintiff,            )    **ORDER GRANTING IN PART AND DENYING
                                    )    IN PART DEFENDANTS' MOTION FOR
      v.                            )    SUMMARY JUDGMENT; AND REFERRING
                                    )    CASE TO PRO SE PRISONER SETTLEMENT
                                    )    PROGRAM**
J. PETERSEN, et al.,                )
                                    )    (Docket no. 85)
              Defendants.           )
                                    )
                                    )
_____     )

        Plaintiff Curtis Lee Henderson, Sr., a state prisoner currently incarcerated at California State

Prison - Delano, filed this civil rights action under 42 U.S.C. § 1983 against prison officials at

Pelican Bay State Prison (PBSP) for injuries incurred in 2006.  On October 9, 2007, Plaintiff filed an

amended complaint.  On February 28, 2008, Plaintiff filed a second amended complaint (SAC).  In

an Order dated September 30, 2008, the Court found certain claims in Plaintiff's SAC cognizable and

issued its Order of Service.

        On January 14, 2009, Defendants filed a motion to dismiss on the grounds that Plaintiff's

SAC did not comply with the Federal Rules of Civil Procedure.

        In an Order dated September 30, 2009, the Court granted in part and denied in part

Defendants' motion to dismiss.  The remaining claims in this case include: (1) an excessive force

claim stemming from an incident on August 16, 2006; and (2) a claim of deliberate indifference to

Plaintiff's serious medical needs resulting from the aforementioned excessive force incident.

        On March 1, 2010, Defendants filed their motion for summary judgment on the grounds that

there is no triable issue of material fact, that they are entitled to judgment as a matter of law, and that

they are entitled to qualified immunity.

        In an Order dated June 23, 2010, the Court denied Plaintiff's motion for extension of time

pursuant to Rule 56(f).

        On August 10, 2010, Plaintiff filed his opposition.

        On September 1, 2010, Defendants filed their reply to Plaintiff's opposition.

United States District Court
For the Northern District of California

1    Having read and considered the papers submitted by the parties, the Court hereby GRANTS

2  in part and DENIES in part Defendants' motion for summary judgment and directs the remaining

3  parties to engage in settlement proceedings.

4                                        **DISCUSSION**

5  **I.    Factual Background**

6          **A.    Plaintiff's Version**

7          Plaintiff makes the following allegations in his verified opposition to Defendants' motion for

8  summary judgment:

9          On August 16, 2006, Defendants PBSP Correctional Officers J. Petersen and C. Speaker

10 attempted to place Plaintiff in a double cell with another inmate.  When Plaintiff refused for safety

11 reasons, they handcuffed him and placed him in a cage "approximately 2 ½ feet wide, 2 ½ feet long

12 and 7 feet high where [he] stayed from 3 PM to about 6 or 7 PM."  (Opp'n at 12.)

13         Plaintiff then began having chest pains.  He informed Defendant Speaker that he needed to

14 see the medical technical assistant (MTA).  Defendant Petersen escorted Plaintiff to the rotunda.

15 Plaintiff was searched by Defendant Speaker, who found an address book on Plaintiff and threatened

16 to confiscate it.  (Id. at 13.)  Defendant Petersen kicked Plaintiff's address book across the floor.

17 When Plaintiff bent over to pick up his address book from the floor, Defendant Petersen pulled out

18 his baton and "drove it into [Plaintiff's] back like a stake."  (Id.)  Defendant Speaker grabbed

19 Plaintiff's left arm, pulled out his baton, and hit Plaintiff at "the base of [his] skull, neck and shoulder

20 [blades]."  (Id.)  Defendant Petersen began hitting Plaintiff on his thighs.  (Id.)  Even after Plaintiff

21 pleaded with them to stop, Defendants Petersen and Speaker continued to "assault" him.  (Id. at 14.)

22 Plaintiff "managed to get free of Defendant Speakers [sic] hold on [his] arm [and Plaintiff] then

23 stepped as far away as [he] could from the two defendants to prevent from being beaten any worse."

24 (Id.)  Thereafter, Defendant Petersen "pulled out his O.C. pepper spray and sprayed a long burst of

25 about seven to nine seconds."  (Id.)  Defendant Petersen then "jumped down" on Plaintiff's back

26 "with all of his body weight" and Defendant Speaker "did the same to [Plaintiff's] legs."  (Id. at 14.)

27 Defendants Speaker and Petersen handcuffed Plaintiff, and he "lost circulation in [his] left arm and

28 handcuffs cut deep into [his] skin."  (Id.)  Plaintiff claims that "[a]t no time did [he] hit, kick, swing

United States District Court
For the Northern District of California

or punch these Defendants."  (Id.)  Defendant Speaker ordered Defendant PBSP Correctional Officer M. D. Bullock to hold Plaintiff down.  (Id.)

Plaintiff pleaded for Defendants PBSP Lieutenants D. A. Christ and G. Kelly to "take charge of the situation;" however, they walked away and allowed the assault to continue.  (Id.)  Defendant PBSP Correctional Officer J. McBride was also present, but he failed to intervene and prevent any further beating.  (Id.)

Although Plaintiff was not resisting, Defendant Bullock "jumped down on [Plaintiff's] back, grabbed [his] head and violently wrenching it to the left, slamming the right side of [his] face to the concrete floor and then punched [him] in the left side of [his] jaw."  (Id.)  Plaintiff could not defend himself because he was in handcuffs and leg irons at that time.  (Id.)

Defendant Bullock "rushed [Plaintiff] to the mini yard and forced [him] under a shower with freezing cold water."  (Id. at 15.)  Plaintiff was then placed in a cage.  (Id.)  Plaintiff claims he "asked for the MTA and told them [he] couldn't feel [his] arms these Defendants just walked out, denying [him] medical care."  (Id.)  It was only when two other inmates demanded medical treatment for Plaintiff that Defendants came back and took him to Defendant PBSP MTA J. T. Patch for treatment. (SAC at 16-17.)

Plaintiff claims that Defendant Patch "falsified the medical report 7219 stating that [Plaintiff] had no injuries.  This was done to cover up the assault on [him]."  (Id. at 17.)  Defendant Patch witnessed the incident and "knew [Plaintiff] had serious injuries."  (Id.)

On August 17, 2006, PBSP MTA Gurose saw Plaintiff's wounds and ordered him out of his cell in order to document the injuries.  (Opp'n at 15.)  An investigation into the use of excessive force was ordered.  (Id.)  Defendant Christ conducted the investigation, and Plaintiff objected because Defendant Christ witnessed the beating and failed to intervene.  (Id.)

The record includes a DVD with a video-tape recording of Plaintiff's interview conducted by Defendant Christ.  At the end of the interview, Plaintiff was asked to show his visible injuries to the camera.  The injuries displayed on camera included two small abrasions on Plaintiff's back and another abrasion on his thigh.  (DVD of Pl.'s Interview.)

On August 18, 2006, Plaintiff was seen by PBSP Physician Dr. Jain, and x-rays revealed a

1  series of fractures that healed in a "deformed [sic] manner." (Opp'n at 15.) Dr. Jain ordered special

2  handcuffs and wrist splints for Plaintiff's nerve damage. (Id. at 16.)

3       As a result of the August 16, 2006 assault, Plaintiff suffered from headaches, difficulty

4  breathing, numb wrists, and constant pain to his right hand due to the fractures. (Id. at 16.) He has

5  also undergone two operations on his right and left elbows to correct nerve damage. (Id.)

6       Plaintiff seeks monetary damages. (SAC at 26-27.)

7       **B.    Defendants' Version**

8       On August 16, 2006, Defendants Petersen and Speaker were working as floor officers in

   Building 5 of B Facility at PBSP. (Decl. of Petersen In Supp. Defs.' Mot. Summ. J. (Decl. Petersen)

9  ¶ 2; Decl. of Speaker In Supp. Defs.' Mot. Summ. J. (Decl. Speaker) ¶ 2.)

10      At approximately 8:40 p.m., Defendant Petersen was notified that Plaintiff was complaining

11 of chest pains. (Decl. Petersen ¶ 3.) Defendant Petersen contacted Defendant Patch, the B Facility

12 MTA, and explained that Plaintiff was complaining of chest pains. (Id.) Defendant Patch told

13 Defendant Petersen that he would examine Plaintiff in the unit rotunda, and that he was on his way.

14 (Id.) Defendants Speaker and Petersen escorted Plaintiff to the unit rotunda. (Decl. Speaker ¶ 2.)

15 While waiting for Defendant Patch to arrive, Plaintiff sat straddling a chair in the middle of the

16 rotunda. (Decl. Petersen ¶ 3.) Defendant Speaker asked Plaintiff to stand up so that he could

17 conduct a cursory search of Plaintiff. (Id.) This search was a precaution in case Plaintiff had to be

18 transported out of the unit, and it is part of PBSP's standard operating procedure for safety and

19 security. (Decl. Speaker ¶ 2.)

20      During the search of Plaintiff, Defendant Speaker removed folded paper towels and an

21 address book that he dropped at Plaintiff's side because he did not know what these items contained.

22 (Decl. Speaker ¶ 2.) For safety and security, Defendant Petersen moved the address book away from

23 Plaintiff using his foot. (Decl. Petersen ¶ 4.) Plaintiff then returned to his chair, and he appeared

24 agitated that his address book was taken from him. (Id.) Defendant Petersen explained to Plaintiff

25 that he did not need his address book and that it would be returned to him. (Id.) However, Plaintiff's

26 agitated state escalated. (Id.) He quickly stood up from the chair and faced Defendant Speaker in an

27 aggressive stance. (Id.) Defendant Petersen could see that Plaintiff, who was not handcuffed, was

United States District Court
For the Northern District of California

1   acting aggressively toward Defendant Speaker.  (Id.)  Plaintiff then lunged towards Defendant

2   Speaker, who was standing near the address book that was laying on the floor.  (Decl. Speaker ¶ 3.)

3   Defendant Petersen ordered Plaintiff to sit back in his chair two times, but he did not comply with

4   the orders.  (Id.)  With Plaintiff still standing, Defendant Petersen moved behind him and put both

5   arms around his upper body in an attempt to bring him to the ground.  (Decl. Petersen ¶ 4.)  Although

6   Plaintiff was able to maintain his balance, Defendant Petersen's actions pushed him towards the

7   rotunda wall.  (Id.)  Once Plaintiff was against the wall, Defendant Petersen ordered him to get

8   down.  (Id.)  Again, Plaintiff failed to comply.  (Id.)  Because Plaintiff was not complying with

9   orders and to minimize the safety and security threat to the officers, Defendant Petersen sprayed a

10  three-second burst of O. C. pepper spray in the direction of Plaintiff's face and upper torso.  (Decl.

11  Petersen ¶ 4.)

12      Upon being sprayed, Plaintiff ran toward the officers, swinging his arms with hands clenched

13  in fists.  (Decl. Petersen ¶ 6.)  At that point, Defendant Speaker extended his expandable baton.  (Id.)

14  Defendant Speaker struck Plaintiff with a baton on the right thigh, in an effort to protect himself and

15  to attempt to gain compliance over Plaintiff.  (Decl. Speaker ¶ 4.)  However, Plaintiff continued

16  towards Defendant Speaker and hit him with his shoulder.  (Id.)  The collision with Plaintiff knocked

17  Defendant Speaker backwards into the door jam of the unit 5 office.  (Id.)

18      Fearing for the safety of Defendant Speaker, Defendant Petersen also extended his baton.

19  (Decl. Petersen ¶ 6.)  At this time, Plaintiff was outside the door jam.  (Id.)  Defendant Petersen

20  struck Plaintiff with his baton one time in the right shoulder blade area and one time in the right

21  kidney area.  (Id.)  Plaintiff pushed past Defendant Speaker, who then struck Plaintiff's upper body

22  twice with his baton to gain compliance and control over Plaintiff.  (Decl. Speaker ¶ 4.)  After each

23  strike from the batons, Plaintiff continued to struggle by planting his feet and twisting his body,

24  making it difficult for Defendants Petersen and Speaker to hold him.  (Decl. Petersen ¶ 6.)  Finally,

25  Defendants Speaker and Petersen were able to hold Plaintiff, who was still resisting, and they

26  brought him to the ground using their body weight.  (Id.)  Defendants Petersen and Speaker placed

27  Plaintiff faced down on the ground of the rotunda.  (Decl. Speaker ¶ 4.)  Defendant Speaker was able

    to place handcuffs on Plaintiff.  (Id.)  After Defendant Speaker placed handcuffs on Plaintiff,

1  additional staff arrived at the rotunda in response to the unit alarm activated when the incident began.

2  (Decl. Speaker ¶ 4; Decl. of Bullock In Supp. Defs.' Mot. Summ. J. (Decl. Bullock) ¶ 2.)  Defendants

3  Speaker and Petersen claim they used force only to protect each other and to gain compliance and

4  control of Plaintiff.  (Decl. Speaker ¶ 5; Decl. Petersen ¶ 8.)  They were aware that medical personnel

5  had responded and were present in the rotunda.  (Decl. Speaker ¶ 6; Decl. Petersen ¶ 9.)  As such,

6  they believed that Plaintiff would be evaluated by medical staff and any appropriate care would be

7  provided.  (Id.)

8        Defendants Christ, Kelly and McBride claim that they arrived after the incident had occurred

9  and had no opportunity to intervene to prevent the alleged acts of excessive force.  (Decl. of Christ In

10  Supp. Defs.' Mot. Summ. J. (Decl. Christ) ¶ 2; Decl. of Kelly In Supp. Defs.' Mot. Summ. J. (Decl.

11  Kelly) ¶ 2; Decl. of Christ In Supp. Defs.' Mot. Summ. J. (Decl. McBride) ¶ 2.)

12        Defendant Patch arrived at the rotunda as the incident was occurring.  While he did not see

13  the entire incident, he saw Defendants Petersen and Speaker attempting to gain control and

14  compliance from Plaintiff.  (Decl. of Patch In Supp. Defs.' Mot. Summ. J. (Decl. Patch) ¶ 3.)

15  Defendant Patch also observed that Plaintiff was acting in a hostile manner towards the officers.

16  (Id.)

17        Defendant Bullock was working as a floor officer in Building 4 of B Facility on August 16,

18  2006 and responded to the Building 5 alarm at approximately 8:40 p.m.  (Decl. Bullock ¶ 2.)  When

19  he arrived at Building 5, he observed Plaintiff on the ground in the prone position in handcuffs.  (Id.)

20  Officer Holmes then placed leg irons on Plaintiff.  (Id.)  Defendant Bullock and Officer Holmes were

21  ordered by Sergeant Thompson, who had also arrived at Building 5, to take Plaintiff to the concrete

22  yard shower to have Plaintiff decontaminated from exposure to O.C. pepper spray. (Decl. Bullock

23  ¶ 2; Decl. of Thompson In Supp. Defs.' Mot. Summ. J. (Decl. Thompson) ¶ 2.)

24        Defendant Bullock and Officer Holmes escorted Plaintiff to the concrete yard shower and

25  offered Plaintiff to decontaminate under cold water.  (Decl. Bullock at ¶ 2.)  Plaintiff was not forced

26  to be decontaminated.  (Id.)  Rather, Plaintiff agreed to be placed under the cold water to

27  decontaminate.  (Id.)

       After being decontaminated, Plaintiff was medically evaluated by Defendant Patch.  (Decl.

Patch ¶ 4 & Ex. A.)  Defendant Patch did not see any visible injuries.  (Id.)  Further, Plaintiff did not complain about any chest pains or other medical problems.  (Id.)  However, Defendant Patch noted that Plaintiff's upper torso was reddened as a result of the O.C. pepper spray exposure.  (Id.) Defendant Patch filled out a CDCR Form 7219, which is a medical evaluation form, in order to note details relating to his examination of Plaintiff.  (Id.)  Later that night, Defendant Patch also noted in an addendum to the CDCR Form 7219 that he expected some injuries to become visible later. (Decl. McDonough In Supp. Defs.' Mot. Summ. J. (Decl. McDonough), Ex. B at 1.)  Following PBSP medical procedures, Defendant Patch called the Correctional Treatment Center and spoke with Nurse Storrs.  (Decl. Patch ¶ 4.)  Based on Defendant Patch's medical examination of Plaintiff, Nurse Storrs medically cleared Plaintiff for administrative segregation housing.  (Id.)  As the MTA, Defendant Patch was responsible for the medical care of Plaintiff after this incident.  (Id.)  In fact, from the time Defendant Patch arrived at Building 5 until the time Plaintiff was cleared for administrative segregation, Defendant Patch was responsible for Plaintiff's care.  (Id.)  Defendant Patch believes that the other Defendants knew that he was present and responding to Plaintiff's medical needs.  (Id.)  All other Defendants claim they were aware that Defendant Patch was present in the housing unit while Plaintiff was being placed in mechanical restraints, and that Defendant Patch examined Plaintiff before he was taken from the housing unit to be decontaminated.  (Decl. Thompson ¶ 3; Decl. Kelley ¶ 3; Decl. McBride ¶ 2; Decl. Bullock ¶ 4; Decl. Speaker ¶ 6; Decl. Petersen ¶ 9; Decl. Christ ¶ 2; Decl. Patch ¶¶ 4-5.)

Plaintiff was eventually medically cleared for administrative segregation.  (Decl. Bullock ¶ 2.)  Officer Holmes and Defendant Bullock escorted Plaintiff to administrative segregation, where he was placed in a holding cell.  (Id.)  Plaintiff was medically evaluated the following day by a prison medical physician, Dr. Jain, who noted two superficial abrasions to Plaintiff's back, mild tenderness on the left side of his jaw, and some tenderness on the left side of Plaintiff's chest.  (Decl. McDonough, Ex B at 2.)  Dr. Jain also noted that the movement of Plaintiff's jaw was within normal limits.  (Id.)  X- rays taken on August 21, 2006 showed no fractures or dislocations to Plaintiff's jaw. (Decl. McDonough, Ex. B at 3.)

As the B Facility Lieutenant, Defendant Christ acted as the incident commander for the

United States District Court
For the Northern District of California

August 16, 2006 incident, and was responsible for ensuring that the entire facility was secure.  (Decl. Christ ¶ 3.)  As incident commander, he also conducted an investigation.  (Id.)  These responsibilities are based on PBSP policies and procedures.  (Id.)  Defendant Christ subsequently reviewed reports, conducted interviews of correctional staff, and interviewed Plaintiff regarding his allegations of excessive force.  (Id.)  Defendant Christ drafted a Crime/Incident Report, CDCR Form 837-A.  (Id.)  Through his investigation, Defendant Christ determined that the force used by staff was appropriate under the circumstances because it was necessary to protect the officers involved, to maintain the unit's safety and security, and was a reasonable response to Plaintiff's actions.  (Id.)

## II.   Legal Standard for Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  See id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted.  See Liberty Lobby, 477 U.S. at 249-50.  However, "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."  Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001).

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A dispute about a material fact is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Liberty Lobby, 477 U.S. at 248.  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  Celotex Corp., 477 U.S. at 323.

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  A court may not disregard direct evidence on the ground that no reasonable jury would believe it.  See id. (where nonmoving party's direct evidence raises genuine issues of fact but is called into question by other unsworn testimony, district court may not grant summary judgment to moving party on ground that direct evidence is unbelievable).  The district court may not resolve disputed issues of material fact by crediting one party's version of events and ignoring another.  Wall v. County of Orange, 364 F.3d 1107, 1111 (9th Cir. 2004). "By deciding to rely on the defendants' statement of fact [in deciding a summary judgment motion], the district court became a jury."  Id.  But "[w]hen opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly discredits plaintiff's claim that there was little or no actual threat to innocent bystanders).

### A.   Excessive Force Claim

#### 1.   Applicable Legal Standard

The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 31 (1993). "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  Whitley v. Albers, 475 U.S. 312, 319 (1986) (ellipsis in original) (internal quotation and citation omitted).  A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively,

**United States District Court**
For the Northern District of California

sufficiently serious, <u>Farmer v. Brennan</u>, 511 U.S. 824, 834 (1994) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, <u>id.</u> (citing <u>Wilson</u>, 501 U.S. at 297); <u>LeMaire v. Maass</u>, 12 F.3d 1444, 1451 (9th Cir. 1993).

What is required to establish an unnecessary and wanton infliction of pain varies according to the nature of the alleged constitutional violation. <u>Whitley</u>, 475 U.S. at 320. Where an inmate alleges that the conditions of confinement inflict unnecessary suffering upon him, to establish wantonness the inmate must show that prison officials were deliberately indifferent to the inmate's suffering. <u>Jordan v. Gardner</u>, 986 F.2d 1521, 1528 (9th Cir. 1993); <u>see, e.g.</u>, <u>Farmer</u>, 511 U.S. at 837 (inmate safety); <u>Helling</u>, 509 U.S. at 32-33 (inmate health); <u>Wilson</u>, 501 U.S. at 302-03 (general conditions of confinement); <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) (inmate health). But whenever prison officials stand accused of using excessive force in violation of the Eighth Amendment, the deliberate indifference standard is inappropriate. <u>Hudson v. McMillian</u>, 503 U.S. 1, 6 (1992). Instead, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. <u>Id.</u> at 6-7; <u>Whitley</u>, 475 U.S. at 320-21; <u>Jeffers v. Gomez</u>, 267 F.3d 895, 912-13 (9th Cir. 2001) (applying "malicious and sadistic" standard to claim that prison guards used excessive force when attempting to quell a prison riot, but applying "deliberate indifference" standard to claim that guards failed to act on rumors of violence to prevent the riot).

Prison guards may be held liable if they have an opportunity to intercede but fail to do so when their fellow guards violate the constitutional rights of a plaintiff. <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1289-90 (9th Cir. 2000); <u>Motley v. Parks</u>, 383 F.3d 1058, 1071 (9th Cir. 2004). The passive defendant violates a constitutional right that "is analytically the same as the right violated by the person who strikes the blows." <u>United States v. Koon</u>, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), <u>rev'd on other grounds</u>, 518 U.S. 81 (1996). On the other hand, if a guard is not present during a constitutional violation, or if a violation happens so quickly that a guard had no "realistic opportunity" to intercede, then the guard is not liable for failing to intercede. <u>Cunningham</u>, 229 F.3d at 1290.

### 2.   **Analysis**

In assessing the first requirement of <u>Farmer</u>, the Court must determine whether the force used was sufficiently serious.  Plaintiff alleges that Defendants Petersen, Speaker, Bullock used excessive force to maliciously and sadistically cause him harm, and that Defendants Christ, Kelley and McBride failed to intervene during the assault.  (Opp'n at 1.)  Specifically, Plaintiff alleges that Defendants Petersen, Speaker and Bullock assaulted him upon confiscating his address book by beating him with a baton, jumping on his back, and punching his jaw.  (<u>Id.</u> at 2.)  Plaintiff adds that Defendant Speaker then grabbed his arm and used a baton to hit him at the base of his skull, neck and shoulder while Defendant Petersen struck his thighs.  (<u>Id.</u> at 13.)  In addition to being beaten with a baton, Plaintiff claims that Defendant Petersen sprayed him with O.C. pepper spray.  (<u>Id.</u>)  Defendants Petersen and Speaker acknowledge that after using O.C. pepper spray on Plaintiff, they then used their batons again in order to "regain control and restore security."  (Decl. Speaker ¶¶ 3-5, Decl. Petersen ¶¶ 4, 6.)

While Defendants Petersen, Speaker and Bullock were not required to use the least intrusive degree of force possible; they were required only to act within a reasonable range of conduct.  Here, Defendants Petersen, Speaker and Bullock claim to have used force as an appropriate response to Plaintiff's resistance.  However, Plaintiff denies that he resisted.  (Opp'n at 14.)  Even if Defendants believed that Plaintiff posed an immediate threat to their safety, this threat must be evaluated within the totality of the circumstances and balanced against the amount of force Defendants applied.  Plaintiff claims he was compliant with Defendants' orders.  Viewing the totality of the circumstances in relation to the amount of force used -- three officers disbursing O.C. pepper spray on one individual and beating that same individual with a baton -- was excessive and unreasonable.  If Plaintiff is believed that he was handcuffed extremely tightly, placed in leg irons, sprayed with O.C. pepper spray, and beaten severely by a baton without provocation, then the amount of force used by Defendants Petersen, Speaker and Bullock was unnecessary and excessive.  Viewing the evidence in the light most favorable to Plaintiff, he has established a genuine issue for trial concerning the excessiveness of force used on him on August 16, 2006 by Defendants Petersen, Speaker and

The margin on the left: "United States District Court / For the Northern District of California"

1  Bullock.

2       In assessing the second requirement of <u>Farmer</u>, the Court must also determine if Defendants

3  possessed a sufficiently culpable state of mind.  Plaintiff claims that Defendants Petersen and

4  Speaker used their batons and sprayed him with O. C. pepper spary.  (Opp'n at 13-14).  Defendants

5  Petersen and Speaker do not dispute this.  (Decl. Speaker ¶¶ 3-5, Decl. Petersen ¶¶ 4, 6.)  Plaintiff

6  also claims that Defendant Bullock also assaulted him while he was handcuffed and placed in leg

7  irons.  (Opp'n at 14.)  Plaintiff adds that Defendants Christ, Kelley and McBride were present during

8  the beating and witnessed him in his restrained stance; however, they failed to intervene or act at all.

9  (Pl.'s Decl., Ex. D.)  The core judicial inquiry is whether the force was applied in a good-faith effort

10 to maintain or restore discipline, or maliciously and sadistically to cause harm.  <u>Id.</u> at 6-7; <u>Whitley</u>,

11 475 U.S. at 320-21; <u>Jeffers</u>, 267 F.3d at 912-13.  Here, three officers used force upon Plaintiff while

12 three other officers failed to intervene.  It would be reasonable to apply such force and feign

13 culpability if Plaintiff were not compliant with the officer's orders.  Plaintiff claims, however, that he

14 did not resist by kicking or hitting Defendants at any time.  (Opp'n at 14.)

15      Even if Plaintiff were not fully compliant because he did not remain seated in his chair, there

16 were a total of six officers who could have controlled him; however, he was still continuously

17 assaulted with batons, O.C. pepper spray and physical force.  Plaintiff's version of the unprovoked

18 use of force by Defendants Petersen, Speaker and Bullock while Plaintiff was being compliant would

19 lead to a conclusion that the force used by these Defendants was excessive.  Meanwhile, if believed,

20 Defendants Petersen's, Speaker's and Bullock's description of using force necessary to subdue a

21 resisting inmate would lead to a conclusion that the force used was not excessive.  Based on

22 Plaintiff's allegations, the Court would have to find that Defendants Petersen's, Speaker's and

23 Bullock's conduct was not applied in a good-faith effort to restore discipline, but instead maliciously

24 and sadistically to cause harm; thus, it does amount to an unconstitutional use of unreasonable force.

25 To grant summary judgment for Defendants, the Court would have to accept their version of events

26 while rejecting Plaintiff's.  However, the Court cannot make credibility determinations in connection

27 with a summary judgment motion.  Thus, the Court finds that Plaintiff has established a "'genuine

1  issue for trial'" concerning the excessiveness of the force used on him on August 16, 2006.  Celotex

2  Corp., 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

3         If the force used against Plaintiff by Defendants Petersen, Speaker and Bullock did amount to

4  an Eighth Amendment violation, Defendants Christ, Kelly and McBride are potentially liable for

5  failing to intervene to prevent the constitutional violation.  Defendants Christ, Kelly and McBride

6  argue that they had no opportunity to intervene to prevent the alleged acts of excessive force,

7  because by the time they arrived the incident had already occurred.  (Decl. Christ ¶ 2; Decl. Kelly ¶

8  2; Decl. McBride ¶ 2.)  However, Plaintiff alleges that these Defendants were present during the

9  incident, but failed to intervene.  (Opp'n at 14.)  Moreover, Plaintiff alleges that he made eye contact

10  with Defendant Christ, who ended up walking away and allowing Defendants Petersen, Speaker and

11  Bullock to continue to assault Plaintiff.  (Pl.'s Decl., Ex. E.)  Plaintiff has created a genuine issue of

12  fact as to whether Defendants Christ, Kelly and McBride had an opportunity to intervene to prevent

13  the use excessive force against Plaintiff by the other Defendants.  See Koon, 34 F.3d at 1447 n.25

14  (finding liability for failure to intervene where one officer witnesses another striking blows).

15         Therefore, the Court finds that Defendants Petersen, Speaker, Bullock, Christ, Kelly and

16  McBride are not entitled to summary judgment on the excessive force claim as a matter of law.  See

    Celotex Corp., 477 U.S. at 324.

17              **3.     Qualified Immunity**

18         Defendants argue, in the alternative, that summary judgment is warranted because, as

19  government officials, they are entitled to qualified immunity from Plaintiff's Eighth Amendment

20  excessive force claim.

21         The defense of qualified immunity protects "government officials . . . from liability for civil

22  damages insofar as their conduct does not violate clearly established statutory or constitutional rights

23  of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

24  The threshold question in qualified immunity analysis is:  "Taken in the light most favorable to the

25  party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

26  right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  A court considering a claim of qualified

27  immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional

right and whether such right was "clearly established." Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier and holding that court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case).  Where there is no clearly established law that certain conduct constitutes a constitutional violation, the defendant cannot be on notice that such conduct is unlawful.  Rodis v. County of San Francisco, 558 F.3d 964, 970-71 (9th Cir. 2009) (applying Pearson to find no clearly established right before evaluating whether there was a deprivation).  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Saucier, 533 U.S. at 202.

The qualified immunity analysis is separate from the Eighth Amendment excessive force analysis.  See Marquez v. Gutierrez, 322 F.3d 689, 691 (9th Cir. 2003).  Thus, a guard can do an act which would violate an inmate's Eighth Amendment right but still be entitled to qualified immunity if a reasonable officer in his position would have believed that his response was a good faith effort to restore discipline.  See id. at 692-93 (guard who shot passive, unarmed inmate standing near a fight between other unarmed inmates when no inmate was in danger of great bodily injury would inflict unnecessary and wanton pain, but was entitled to qualified immunity because a reasonable official standing where the guard was standing (i.e., in a tower 360 feet away from the disturbance) could perceive that both plaintiff and another inmate were kicking a third inmate and threatening him with serious injury or death and that the third inmate was unable to protect himself – even if no kick was actually administered by plaintiff); cf. Watts v. McKinney, 394 F.3d 710, 712-13 (9th Cir. 2005) (finding that prison guard could not reasonably believe that he could lawfully kick the genitals of a prisoner who was on the ground and in handcuffs).

Under Saucier, the court must undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment.  533 U.S. at 201.  The court first faces "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id.  To determine whether a

defendant's conduct violated constitutional rights, the court should examine the facts in the light most favorable to the party asserting the injury.  Id.  If the court determines that a constitutional right has been violated, it then moves to the second step and asks whether the right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 201-02.

In applying the first prong of Saucier, the Court must determine whether there was a constitutional violation.  Viewing the evidence in the light most favorable to Plaintiff, Defendants Christ's, Kelley's and McBride's actions did amount to an Eighth Amendment violation as Plaintiff has raised a triable issue of fact as to the excessiveness of the force used against him.

Applying the second prong of Saucier, the Court must determine whether the right violated was "clearly established."  Deorle v. Rutherford, 272 F.3d 1272, 1287-87 (9th Cir. 2001).  It is not disputed that, at the time of Defendants Petersen's, Speaker's and Bullock's actions, the use of excessive force by correctional officers on a prisoner -- who is not resisting -- was a violation of the Eighth Amendment.  Furthermore, the case law at that time clearly prohibited failing to intervene to prevent the use of excessive force by Defendants Christ, Kelley, and McBride, given the opportunity to do so.  See Jeffers, 267 F.3d at 912-13 (applying "deliberate indifference" standard to claim that guards failed to act on rumors of violence to prevent the riot).  A reasonable officer could not have believed that using excessive force and failing to intervene to prevent the amount of force used -- spraying Plaintiff with O.C. pepper spray and assaulting him with a baton -- was lawful in light of clearly established law and the information that the aforementioned Defendants possessed at the time of the incident.  See Saucier, 533 U.S. at 205.

The Court further notes that Defendants raised for the first time in their reply the claim that Plaintiff had a history of attacking prison staff.  A "district court need not consider arguments raised for the first time in a reply brief."  Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (citation omitted).  Arguments that are "not specifically and distinctly argued in [the] opening brief" are waived.  Dream Games of Ariz., Inc. v. PC Onsite, 561 F.3d 983, 995 (9th Cir. 2009) (internal quotation marks and citations omitted); accord See In re Rains, 428 F.3d 893, 902 (9th Cir. 2005) (finding an issue waived where it was raised for the first time in a reply brief before the district

**United States District Court**

For the Northern District of California

1    court); <u>Bazuaye v. INS</u>, 79 F.3d 118, 120 (9th Cir. 1996) (per curiam) ("Issues raised for the first

2    time in the reply brief are waived.").  The bare assertion of an issue in an opening brief is insufficient

3    to present the matter for determination.  <u>Indep. Towers of Wash. v. Wash.</u>, 350 F.3d 925, 930 (9th

4    Cir. 2003) (courts review only issues which are argued specifically and distinctly in a party's opening

5    brief.).  Here, Defendants did not mention Plaintiff's allegedly violent history in their motion for

6    summary judgment.  Even if they did so in their reply, they fail to state that they had any knowledge

7    of Plaintiff's violent history at the time of the incident.  Even so, there would be no reason for the

8    Court to believe that Plaintiff's violent history would justify Defendants' use of force in this instance.

9         Accordingly, Defendants Petersen, Speaker Bullock, Christ, Kelley and McBride are not

10   entitled to qualified immunity as a matter of law with respect to Plaintiff's claim of excessive force.

11        **B.**     **Deliberate Indifference to Medical Needs Claim**

12             **1.**     **Applicable Legal Standard**

13        Deliberate indifference to serious medical needs violates the Eighth Amendment's prohibition

14   against cruel and unusual punishment.  <u>See Estelle</u>, 429 U.S. at 104; <u>McGuckin v. Smith</u>, 974 F.2d

15   1050, 1059 (9th Cir. 1992), <u>overruled on other grounds by WMX Technologies, Inc. v. Miller</u>, 104

16   F.3d 1133, 1136 (9th Cir. 1997) (en banc); <u>Jones v. Johnson</u>, 781 F.2d 769, 771 (9th Cir. 1986).  The

17   analysis of a claim of "deliberate indifference" to serious medical needs involves an examination of

18   two elements: (1) a prisoner's serious medical needs and (2) a deliberately indifferent response by the

19   defendants to those needs.  <u>McGuckin</u>, 974 F.2d at 1059.

20        A serious medical need exists if the failure to treat a prisoner's condition could result in

21   further significant injury or the "wanton infliction of unnecessary pain."  <u>Id.</u>  (citing <u>Estelle</u>, 429 U.S.

22   at 104).  The existence of an injury that a reasonable doctor or patient would find important and

23   worthy of comment or treatment; the presence of a medical condition that significantly affects an

24   individual's daily activities; or the existence of chronic and substantial pain are examples of

25   indications that a prisoner has a serious need for medical treatment.  <u>Id.</u> at 1059-60 (citing <u>Wood v.

26   Housewright</u>, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

27        A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk

     of serious harm and disregards that risk by failing to take reasonable steps to abate it.  <u>Farmer</u>, 511

U.S. at 837. The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." Id. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002).

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. See McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however. Neither a finding that a defendant's actions are egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights, McGuckin, 974 F.2d at 1060, 1061 (citing Hudson, 503 U.S. at 7-10 (rejecting "significant injury" requirement and noting that Constitution is violated "whether or not significant injury is evident")), but the existence of serious harm tends to support an inmate's deliberate indifference claims, Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin, 974 at 1060).

Once the prerequisites are met, it is up to the factfinder to determine whether deliberate indifference was exhibited by the defendant. Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. See McGuckin, 974 at 1062 (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).

### 2.   Plaintiff's Claims Against Defendants Petersen, Speaker, Bullock, McBride, Christ and Kelley

Plaintiff claims that, after being beaten, he requested medical treatment for his injuries. He requested medical treatment because he did not have any feeling in his arms; however, Defendants allegedly walked out and denied him medical treatment. (Opp'n at 15.) After two other inmates demanded medical treatment for Plaintiff, Defendants came back and took him to Defendant Patch for treatment. (SAC at 16-17.) Plaintiff does not specify how long Defendants took to return and does not allege that a large amount of time passed before he was seen by the MTA. (Decl. Pl., Ex.G)

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Beginning with the first step in the analysis, the seriousness of Plaintiff's injuries, Plaintiff alleges that he suffered from abrasions on his back and thigh as well as pain to his jaw stemming from the excessive force incident.  Therefore, Plaintiff has established that a "serious" medical need for treatment exists based on his allegations of pain and injury.  See McGuckin, 974 F.2d at 1059-60.

Turning to the second prong of the deliberate indifference analysis, i.e., the nature of Defendants' response to Plaintiff's serious medical need for treatment, the Court finds that Defendants' actions were reasonable and appropriately tailored to providing treatment to Plaintiff's injuries.  Plaintiff concedes that Defendants' actions did result in Plaintiff being seen by Defendant Patch.  Indeed, Defendant Patch admits that he was present during the incident and that the other Defendants knew he was there.  Plaintiff does not dispute this.  There is also no evidence that Defendants waited an unreasonable period of time before obtaining medical treatment for Plaintiff or that Plaintiff suffered additional harm as a result of any delay in treatment.  Therefore, a reasonable person in Defendants' situation could have believed that his actions did not violate Plaintiff's clearly established constitutional rights.

Accordingly, Defendants Petersen, Speaker, Bullock, McBride, Christ and Kelley are entitled to summary judgment on the deliberate indifference claim as a matter of law.  See Celotex Corp., 477 U.S. at 323.

### 3.    Plaintiff's Claim Against Defendant Patch

Plaintiff claims that Defendant Patch falsified the medical report to cover up the assault by stating that he had no injuries.  (SAC at 17.)  As a result of this falsification, Plaintiff claims that Defendant Patch denied him medical treatment.  (Id.)  While Defendant Patch initially noted on the CDCR Form 7219 that Plaintiff had no visible injuries other than redness due to O.C. pepper spray exposure, the record shows he later added an addendum to the CDCR Form 7219 noting that he expected some injuries to be visible later.  (Opp'n, Ex. N.)  Defendant Patch then followed PBSP proper medical procedures and called the Correctional Treatment Center in order to speak with Nurse Storrs.  (Id.)  Based on Defendant Patch's explanation and examination of Plaintiff's condition at the time, Nurse Storrs medically cleared Plaintiff and sent him to administrative segregation housing.

18

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

(Id.)  Plaintiff does not dispute that Defendant Patch filled out the CDCR Form 7219 and later had him cleared for administrative segregated housing.  (SAC at 17.)  Even if Plaintiff satisfies the first prong of the deliberate indifference analysis that there was indeed a "serious medical need," he fails to satisfy the second prong of the analysis.  Plaintiff fails to show that Defendant Patch had a deliberate indifferent response to Plaintiff's serious medical needs.  Instead, the undisputed facts show that Defendant Patch followed PBSP proper medical procedures and provided Plaintiff with the proper care and attention he needed at the time of the incident.

Accordingly, Defendant Patch is entitled to summary judgment on the deliberate indifference claim as a matter of law.  See Celotex Corp., 477 U.S. at 323.

**4.      Qualified Immunity**

Defendants claim, in the alternative, that even if Plaintiff's allegations revealed a constitutional violation, qualified immunity would protect them from liability from Plaintiff's deliberate indifference claim.

On these facts, viewed in the light most favorable to Plaintiff, Defendants prevail as a matter of law on their qualified immunity defense because the record establishes no Eighth Amendment violation.  See Harlow, 457 U.S. at 818.  However, even if a constitutional violation had occurred with respect to Plaintiff's claim of deliberate indifference to his serious medical needs, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed their conduct was lawful.  See Estate of Ford v. Caden, 301 F.3d 1043, 1053 (9th Cir. 2002) (extending Saucier to Eighth Amendment claims).

Defendants do not dispute that Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly established during the period within which the injuries complained of occurred.

Given the circumstances, the actions by Defendants Patch, Petersen, Speaker, Bullock, McBride, Christ and Kelley directly after the excessive force incident were reasonably calculated to alleviate Plaintiff's pain and treat his injuries.  Defendant Patch followed proper PBSP medical procedures in response to Plaintiff's injuries.  Likewise, all other Defendants acted as reasonable persons and assumed that calling Defendant Patch, an expert trained to address inmates' medical

needs, would fulfill their obligation in response to Plaintiff. Their actions resulted in a medical examination of Plaintiff by Defendant Patch directly after the excessive force incident. After being examined by Defendant Patch and cleared by Nurse Storrs, Plaintiff was medically evaluated the following day by Dr. Jain. X-rays were also taken on August 21, 2006, which showed no fractures or dislocations to Plaintiff's jaw. (Decl. McDonough, Ex. B at 3.) Therefore, a reasonable person in the same situation as Defendants Patch, Petersen, Speaker, Bullock, McBride, Christ and Kelley could have believed that their actions did not violate Plaintiff's clearly established constitutional rights as they followed PBSP medical procedures and gave Plaintiff the immediate care he needed. It would not have been clear to a reasonable officer that following proper PBSP medical procedures to address Plaintiff's injuries would have been unlawful or would have violated Plaintiff's rights. Although prison officials cannot avoid liability in every case by blindly following a prison's policy because the policy itself could be constitutionally infirm, California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1049-50 (9th Cir. 1999), that is not the case here.

Accordingly, Defendants Patch, Petersen, Speaker, Bullock, McBride, Christ and Kelley are entitled to qualified immunity with respect to Plaintiff's deliberate indifference claim, and their motion for summary judgment is GRANTED on those grounds as well.

**CONCLUSION**

For the reasons stated above, the Court orders as follows:

1.      Defendants' motion for summary judgment is GRANTED in part and DENIED in part (docket no. 85). Summary judgment is GRANTED as to Plaintiff's deliberate indifference claim against Defendants Patch, Petersen, Speaker, Bullock, McBride, Christ and Kelley and DENIED as to Plaintiff's excessive force claim against Defendants Petersen, Speaker, Bullock, McBride, Christ and Kelley.

2.      This case has been pending for three years and the events at issue occurred over four years ago. If the case must go to trial even further delay in resolution will be incurred, as will expenses. A record already exists which includes evidence of internal investigations and detailed medical records of the injuries suffered. Having considered all of these factors, the Court finds that it is in the best interests of the parties and judicial efficiency to REFER this action to a Magistrate Judge

for court-ordered settlement proceedings.

The Northern District of California has established a Pro Se Prisoner Settlement Program. Certain prisoner civil rights cases may be referred to a magistrate judge for a settlement conference. The Court finds that a referral is in order now that Plaintiff's excessive force claim has survived summary judgment. Thus, this case is REFERRED to Magistrate Judge Vadas for a settlement conference.

The conference shall take place within **thirty (30) days** of the date of this Order, or as soon thereafter as is convenient to the magistrate judge's calendar. Magistrate Judge Vadas shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within **ten (10) days** after the conclusion of the conference, file with the Court a report regarding the conference.

The Clerk shall provide a copy of this Order to Magistrate Judge Vadas.

3.      The Clerk shall send a copy of this Order to Plaintiff.

4.      This Order terminates Docket no. 85.

IT IS SO ORDERED.

DATED:  9/30/10

SAUNDRA BROWN ARMSTRONG
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

CURTIS LEE HENDERSON SR,

        Plaintiff,

    v.

CALIFORNIA DEPARTMENT
OF CORRECTION et al,

        Defendant.

_____/

Case Number: CV07-02838 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 8, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Curtis Lee Henderson H-43488
California State Prison - Delano
P.O. Box 5102
Delano,  CA 93216

Dated: October 8, 2010

Richard W. Wieking, Clerk
By: LISA R CLARK, Deputy Clerk